ROBERT A. SWIFT
Lead Counsel
Kohn, Swift & Graf, P.C.
1 South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone No.: (215) 238-1700
rswift@kohnswift.com

Sherry P. Broder #1880
Attorney at Law - A Law Corporation
Davies Pacific Center
841 Bishop Street, Suite 800
Honolulu, Hawaii 96813
Telephone No.: (808) 531-1411
broder@hawaii.rr.net

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| **IN RE:** } | **MDL NO. 840** |
| } | **No. 86-390** |
| **ESTATE OF FERDINAND E. MARCOS** } | **No. 86-330** |
| **HUMAN RIGHTS LITIGATION** } | |
| } | |
| **THIS DOCUMENT RELATES TO:** } | **MEMORANDUM IN SUPPORT** |
| } | **OF CLASS COUNSEL'S JOINT** |
| } | **MOTION FOR AN INTERIM** |
| **Hilao et al v. Estate of Ferdinand** } | **AWARD OF ATTORNEYS'** |
| **E. Marcos,** } | **FEES AND REIMBURSEMENT** |
| **and** } | **OF EXPENSES** |
| **DeVera et al v. Estate of Ferdinand** } | |
| **E. Marcos.** } | **JUDGE: MANUEL L. REAL** |
| } | **DATE:** |
| } | **COURTROOM:** |

19045_1

**MEMORANDUM IN SUPPORT OF CLASS COUNSEL'S
JOINT MOTION FOR AN INTERIM AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

Plaintiff Class Counsel submit this memorandum of law in support of their motion for an interim award of attorneys' fees and reimbursement of expenses. An interim award is appropriate here since (1) there is a final Judgment, (2) Class Counsel have not previously received any award of counsel fees and costs in 19 years, (3) a significant amount has been collected on the Judgment and is, or should be, available for distribution shortly, and (4) Class Counsel continue to execute on the Judgment. Should the Court award fees and expenses in the amounts requested, an estimated $3,200 would be available for distribution to each qualifying Class member.

## INTRODUCTION

This litigation has pioneered a whole new approach to human rights litigation. Courts and academicians judge it a landmark case on a variety of points:

- The first class action human rights case in history

- The first fully litigated human rights case in US history

- The first appellate acceptance of a benchmark award for tort claimants

- The largest personal injury Judgment in US history

- The first human rights Judgment against a former head-of-state

2

19045_1

♦     The first collection of a human rights Judgment from a perpetrator in history

Beyond these triumphs, Class Counsel showed that a large mass tort case could be

efficiently and successfully litigated before a jury.  The only parallel litigation was

the Nurnberg Trials of 1946-47 in which the Allied Powers prosecuted Nazi's for

war crimes.  *See* The Nurnberg Trial, 6 F.R.D. 69 (1946).  This case is now a

paradigm of how the new genre of human rights cases are brought, and served as a

model for the *Holocaust* cases.

It is, therefore, with considerable pride that Class Counsel submit this

request.  Not surprisingly, there is no comparable case to look to for guidance as to

an appropriate fee. [1]

---

[1]     This litigation, and the many appellate decisions that have been written
regarding the issues it has raised, has generated an extensive literature and has had
a substantial impact on other cases.
* This Court's decision on the methodology of compensatory damages in *In re
Marcos Human Rights Litigation*, 910 F.Supp. 1460 (D.HI 1995) has been cited by
both the Fifth and Eleventh Circuits.
* Four law review articles have been written focusing on this case: Joan
Fitzpatrick, *The Future of the Alien Tort Claims Act of 1989: Lessons from In re
Marcos Human Rights Litigation*, 67 St. John's L. Rev. 491 (1993); Ralph
Steinhardt, *Fulfilling the Promise of Filartiga: Litigating Human Rights Claims
against the Estate of Ferdinand Marcos,* 20 Yale J. Int'l L. 65 (1995); Anita
Ramasastry, *Secrets and Lies? Swiss Banks and International Human Rights*, 31
Vand. J. Trans. Law 325 (1998); Riza DeJesus, *Retroactive Application of the
Torture Victim Protection Act to Redress Philippine Human Rights Violations*, 2
Pac. Rim Law & Pol. J. 319 (1993).
* The Ninth Circuit's first published opinion, *Estate of Ferdinand E. Marcos
Human Rights Litigation (Trajano v. Marcos)(Estate I)*, 978 F.2d 493 (9th Cir.
1992), has been cited in 63 other decisions.  It has also been cited in 229 law
review articles and several international law casebooks, including Burns H.

3

## I.    An Interim Award Is Appropriate

Class Counsel request an interim award, not a final award of fees and costs, because of the atypical posture of the litigation. The common fund in this case was generated through a final money Judgment and execution on the Judgment. Class Counsel will continue to execute on the Judgment, which, with accumulated interest, exceeds $3.8 billion. Because the Marcoses have concealed much of the Estate's assets and the courts of the Republic of the Philippines (the "Republic")

Weston, Richard A. Falk, and Hilary Charlesworth, *International Law and World Order* 673 (3rd ed. 1997); Frank Newman and David Weissbrodt, *International Human Rights* 519 (2d ed. 1996); Barry E. Carter and Phillip R. Trimble, *International Law* 941 (2d ed. 1995); Louis Henkin, Richard Crawford Pugh, Oscar Schachter, and Hans Smit, *International Law* 191 (3rd ed. 1993). In addition, an *amicus curiae* brief submitted by international law professors in connection with this appeal was published in 12 Hastings Int'l and Comp. L. Rev. 4 (1988).
* The second published opinion, *Hilao v. Estate of Ferdinand E. Marcos (Estate II)*, 25 F.3d 1467 (9th Cir. 1994), has been cited in 79 subsequent decisions, and was explicitly followed in, for instance, *Van Loan v. Van Loan*, 895 P.2d 614, 616 (Mont. 1995). It has also been cited in 263 law review articles and in several international law casebooks, including Burns H. Weston, Richard A. Falk, and Hilary Charlesworth, *International Law and World Order* 673 (3rd ed. 1997); Henry J. Steiner and Philip Alston, *International Human Rights in Context* 793 (1996); Richard B. Lillich and Hurst Hannum, *International Human Rights* 157 (3rd ed. 1995).
* The third major substantive opinion, *Hilao v. Estate of Marcos (Estate III)*, 103 F.3d 767 (9th Cir. 1996), has already been cited in 77 other decisions, and was explicitly followed in *Arch v. The American Tobacco Co., Inc.*, 175 F.R.D. 469, 493 (E.D.Pa. 1997). It has also been cited in 108 law review articles.
Excerpts from the major substantive cases have been included, with questions and discussion materials, at pages 318-44 in the casebook, *International Law and Litigation in the U.S.*, edited by Jordan J. Paust, Joan M. Fitzpatrick, and Jon M. Van Dyke, and published by WestGroup in 2000.

have yet to recognize the Judgment, Class Counsel may or may not be successful in recovering other property. Should other property be recovered by Class Counsel, they will file a subsequent fee application.  In the instant fee application, counsel rely upon and document their time (about 4,000 hours) and effort in the four successful execution proceedings which produced approximately $36.4 million now on deposit in the common fund.  In any subsequent fee application, it is the totality of their time from the inception of this litigation which will be under consideration, less the 4,000 hours documented herein.  Therefore, the Court will have the opportunity in a later filed fee application to again consider all factors mandated by the Circuit in awarding a reasonable fee.

## II.    Background

The history of this case is laid out in some detail in the Declaration of Robert A. Swift attached hereto as Exhibit "B".  Because the history of the litigation is known to the Court, we will only summarize it here.

Class Counsel have worked on this case for over 20 years pursuing claims for the poorest of the poor.  The central allegation, that a former head-of-state was responsible for the torture, summary execution and disappearance of 10,000 of his countrymen, was of such breadth that few people thought it could survive or be proven (including the Wall Street Journal which decried this case in an editorial on December 12, 1995 holding out Judge Real and Lead Counsel for ridicule; *see*

Exhibit "C"). In fact, the original judge assigned to the case dismissed it on Act of State grounds, and three (3) years passed before the case was reinstated by the Ninth Circuit.

The case was defended by a cadre of experienced attorneys in the United States with national reputations who were paid in excess of $5 million for their efforts. They were assisted by the Marcoses' legion of Filipino attorneys. Discovery was fraught with real danger as well as frustration. The Philippine military, which had carried out Marcos' suppression, was hostile to the case and denied having any documents. There were a half dozen coup attempts by the military between 1987 and 1991, leading Filipinos to worry that a military regime would supplant the new democratic regime. Witnesses were frightened to come forward and be named or testify. Before and following the deposition of Mrs. Marcos at her home in San Juan, Metro-Manila in January 1993, Class Counsel were jeered and assaulted by a mob of 500 people that had been organized by the Marcos family. *See* Exhibit "D". In October 1994 the Republic obtained a temporary restraining order against Class Counsel taking depositions. As a result of obeying this Court's Order to continue with the depositions, Lead Counsel had to undergo a contempt hearing before a Philippine court at which he was threatened with deportation. In June 1997 a smaller crowd of 50 persons organized

6

by the Marcoses jeered and confronted Class Counsel as they left a court hearing in Manila to enforce the Judgment in this case.

Lead Counsel traveled to the Philippines almost 30 times in the course of the case. Prior to a final Judgment, Class Counsel conducted significant discovery, including about 250 depositions. The majority of pretrial depositions were conducted in the Philippines, with a dozen videotaped for use at trial. The depositions of the Philippine Secretary of Defense and Chief of Staff of the Philippine military were taken. A total of 10 expert witnesses testified at deposition and trial. Thousands of documents obtained from FOIA requests and governmental archives were reviewed. After years of effort, Class Counsel finally gained access to records kept by Ferdinand E. Marcos at his presidential palace which had not been destroyed. These proved valuable at trial to show that Marcos had knowledge of ongoing torture and execution of civilians.

The trial was conducted in three phases: liability, exemplary damages and compensatory damages. The liability trial in September 1992 was a massive logistical undertaking at which almost 50 witnesses testified live or by videotape. All the live witnesses had to travel to Hawaii from the mainland or from the Philippines. After the jury that had heard the liability testimony was reconvened to determine exemplary damages, it returned an award of a stunning $1.2 billion. In advance of the trial on compensatory damages in January 1995 Class Counsel had

7

to take about 200 depositions of claimants (randomly selected) and their witnesses throughout the Philippines in a period of about five weeks. Traveling with court reporters and interpreters, the depositions were conducted in ten languages throughout the Philippines. Class Counsel worked 12 to 16 hour days preparing witnesses and taking testimony. After considering these depositions and the report of the Special Master, the jury awarded the Class $766 million in compensatory damages, for a total Judgment of almost $2 billion.

By 1999 there had been over a dozen appeals at different times to the Ninth Circuit Court of Appeals, eight of which resulted in reported decisions (the 1989 decision on Act of State was unpublished). All appeals had to be extensively briefed and half were argued orally. In over half the appeals the US State Department, the Republic or the Swiss government filed *amicus* briefs opposing Class Counsel.[2] Many involved motion practice in the Ninth Circuit. Two petitions for certiorari were filed. In addition there was extensive satellite

_____

[2]    Class Counsel not only received no lift from any governmental investigation, they were opposed by multiple governments. In this respect, the wisdom of another federal judge in awarding a **one-third** fee resonates:

> [T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill. They did all the work on their own . . . . They invested time and money in this case and well deserve the payment they request.

*In re Gulf Oil/Cities Service Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992).

8

litigation in courts in Hawaii (state), California (state and federal), New York (federal), Illinois (federal), Texas (federal), Colorado (federal), Philippine, Swiss (Zurich, Geneva and Freiburg), and Singapore courts, including the appellate courts.  These involved a subpoena enforcement proceeding (in New York), five letters rogatory proceedings (two in the Philippines and three in Switzerland), three probate proceedings (two in Hawaii and one in California), transfer and enforcement of the Judgment, and eleven execution proceedings.[3]

Class Counsel spent significant time post-trial trying to enforce the Judgment and were successful in litigation over the house ($1 million) and car ($30,000) used by the Ferdinand E. Marcos in Hawaii.  An interpleader proceeding in New York involving ownership of a painting by Pablo Picasso was resolved with the Class receiving $446,534.71.  Certainly the most time-consuming, but successful, execution was the interpleader action known as *Merrill Lynch v. Arelma Inc.*, No. 00-585, where the Class received approximately $35 million which had been deposited by Ferdinand E. Marcos in an account at Merrill Lynch in New York kept in the name of a Panamanian corporation.   After Class Counsel

---

[3]    The execution proceedings included, *inter alia*: *Hilao v. Lei Investments, Inc.* (D.HI); *Hilao v. Estate of Marcos*, Misc. No.30412R (C.D.CA); *Rosales v. Credit Suisse*, 96-6419 (C.D.CA); *Argenal v. Union Bank of Switzerland*, 97-6605 (C.D.CA); *Hilao v. Estate of Marcos*, 97C0477 (N.D.IL); *Republic of the Philippines v. Christie's*, 98-3871 (S.D.N.Y.);  *Mijares v. Estate of Ferdinand Marcos*, (Makati Regional Trial Court, Philippines); *Pimentel v. Merrill Lynch*, 00-580 (D.HI); and *Merrill Lynch v. Arelma Inc.*, 00-595 (D.HI).

19045_1

initiated suit against Merrill Lynch, the latter agreed to deposit the assets at issue with the Court and file an interpleader proceeding. The action was fiercely fought by the Republic, Philippine National Bank, Arelma and The Golden Budha Corporation. In the course of the four year litigation, there were eight interlocutory appeals or mandamuses to the Court of Appeals. The Class prevailed in a non-jury trial in July 2004. There are now three appeals in the Ninth Circuit contesting the judgment. After extensive briefing, the Circuit held a 90 minute oral argument on March 15, 2005. On May 4, 2006 the Ninth Circuit affirmed the judgment below.[4]

In order to preserve a damage remedy, Class Counsel obtained a preliminary and permanent injunction which was upheld on appeal. Class Counsel also obtained a contempt citation against Imelda and Ferdinand R. Marcos for attempting to dissipate the assets of the defendant Estate. The contempt citation was upheld on appeal, and this Court fined them $100,000 per day and assigned the Estate's Swiss bank accounts to the Plaintiff Class. This led to vigorous litigation with the Swiss banks over those accounts, and ultimately a decision of the Swiss Supreme Court on December 9, 1997 establishing as a condition to release of the Marcos Swiss bank accounts that the Plaintiff Class be compensated. Class Counsel both negotiated with the Republic and urged the Republic to pass

---

[4]    The only modification to the judgment was to allow appellant Roxas to receive the same amount as any individual class member.

19045_1

legislation to compensation the Class. Lead Counsel has met on this subject with every President of the Republic since 1986.

Class Counsel devoted considerable time and effort to negotiating a settlement with the Marcos family. Because the Republic claimed title to the Marcos wealth, the three way conflict led to a prolonged impasse. Both the Marcos family and the government were extremely tenacious and have yet to resolve their major differences. Class Counsel spent a week in Hong Kong with a mediator and representatives of the Marcoses, Republic and Swiss government trying to conclude a deal. In 1999 Class Counsel did conclude a settlement agreement with the Marcoses and the Republic for $150 million which received this Court's preliminary and final approval. However, the Republic failed to transfer the settlement proceeds to this Court, thus preventing consummation.

Despite the overwhelming risk that Class Counsel would never be paid for their labors, Class Counsel advanced $1,033,900.09 in costs over the 20 years, including spending over $31,000 for California probate counsel to defend a California probate proceeding brought in bad faith by the plaintiffs in the *Golden Budha* case trying to prevent the Plaintiff Class from collecting on its Judgment; and over $170,000 to Singapore attorneys. But Class Counsel were forced to litigate frugally. One example, Class Counsel convinced all the 10 expert witnesses not to charge for their time. Another example, Lead Counsel created the

11

first countrywide human rights database (as part of giving class notice) with almost 20,000 reported abuses by hiring a computer lab at a Manila university and using students, all for $5,000. When completed, the database was shared with several human rights groups so they could continue inputting data of new abuses.

Class Counsel are continuing litigation to collect the Judgment. The Class is now a party to an interpleader proceeding in Singapore where about $22 million has been deposited with the court. The Class is also litigating ownership of Marcos properties in Texas and Colorado worth over $100 million. The Class continues to litigate in the Philippines to gain recognition of its Judgment there.

## II.    Legal Standards Applicable to Fee Awards

It is the law in this Circuit that "a private plaintiff, or his attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim is entitled to recover from the fund the cost of his litigation, including attorneys' fees." *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 769 (9th Cir. 1977). The purpose of this doctrine is "to spread litigation costs proportionately among all the beneficiaries." *Id.* This rule of law is known as the common-fund doctrine and is firmly rooted in American case law. *See, e.g., Trustees v. Greenough*, 105 U.S. 527 (1882); *Central R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885). Beyond providing just compensation, awards of attorneys' fees from a common fund also serve to encourage skilled counsel to represent those who seek

12

redress for damages inflicted on entire classes of persons, and to discourage future

misconduct of a similar nature.  As Chief Justice Burger explained in *Deposit*

*Guaranty Nat. Bank v. Roper*, 445 U.S. 326, 338 (1980):

> Plainly there has been a growth of litigation stimulated by
> contingent-fee agreements and an enlargement of the role this type of
> fee arrangement has played in vindicating the rights of individuals
> who otherwise might not consider it worth the candle to embark on
> litigation in which the optimum result might be more than consumed
> by the cost. The prospect of such fee arrangements offers advantages
> for litigation by named plaintiffs in class actions as well as for their
> attorneys. For better or worse, the financial incentive that class actions
> offer to the legal profession is a natural outgrowth of the increasing
> reliance on the "private attorney general" for the vindication of legal
> rights; obviously this development has been facilitated by Rule 23.

In *Blum v. Stenson*, 465 US. 886 (1984) the Supreme Court adopted the

percentage method of computing fees as the proper approach in the common-fund

context where, as here, fees are paid out of (not in addition to) the fund recovered:

> Unlike the calculation of attorney's fees under the "common fund
> doctrine," where a reasonable fee is based on a percentage of the fund
> bestowed on the class, a reasonable fee under §1988 reflects the
> amount of attorney time reasonably expended on the litigation." Id.

Compensating counsel in common fund cases on a percentage basis makes good

sense.  First, it is consistent with the practice in the private marketplace where

contingent fee attorneys handling personal injury litigation receive compensation

on a percentage-of-the-recovery method.   Second, a percentage fee provides

plaintiffs' counsel with a strong incentive to maximize the recovery for the plaintiff

class.  Third, the percentage method minimizes the Court's burden in examining time records using the lodestar/multiplier method.

### III.    The Ninth Circuit's Benchmark Award

In *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989), the Ninth Circuit established 25% of a common fund recovery as the "benchmark" award for attorneys fees in common fund actions which the lower court "can then adjust upward or downward to fit the individual circumstances" of the case.  The guiding principle is that the fee award be "reasonable under the circumstances."  *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296 (9th Cir. 1994).  In the Ninth Circuit many district courts have awarded more than 25% of the recovery in cases not nearly as complex nor the results as stunning as the instant case.  *See, e.g., In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454 (9th Cir. 2000)(33% awarded); In re Pacific Enters. Securities Litigation*, 47 F.3d 373, 379 (9th Cir. 1995)(33% awarded); *In re FPI/Agretech Securities Litigation*, 105 F.3d 469 (9th Cir. 1997)(35% awarded).  An upward departure from the benchmark award must be supported by specific findings.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002).

14

IV.    **Several Factors Justify An Interim Award of
30% of the Recovery To Date**

Class Counsel believe that an interim award of 30% of the amount collected

to date, after first deducting expenses, is reasonable and well justified by a number

of factors.

A.    **The Result Achieved Is Extraordinary**

The Judgment of almost $2 billion for the Class was an incredible

achievement.   As described above, this was a hotly contested case involving the

first certified human rights class in judicial history.   It is the first Judgment in a

human rights case against a former head of state.   There was no precedent for the

case, and counsel had devise innovative methods to prove both liability and

damages. At the time the Judgment was affirmed, it was the largest personal injury

award ever to be approved by the Circuit.

The total recovery for the Class to date is approximately $36.4 million.

Assuming fees and costs[5] are awarded as requested, the average payout per claim

will be approximately $3,200.   This amount is **3 times** the average annual family

income for a Filipino family.[6]   Since most members of the Class are either poor or

---

[5]    It is assumed for this computation that the special master's fees and costs are
$600,000; the costs of Class Counsel are $1,033,900.09; the reserve for Singapore
interpleader fees and costs is $100,000; the reserve for costs of distribution is
$75,000; and the number of eligible claims is 7,500.

[6]    The World Bank calculated Filipino annual *per capita* income as $1,030 in

15

very poor, the recovery could easily exceed this multiplier for a Class member. The recovery will make a meaningful difference in the lives of the Class members.

No Class member was required to advance any costs in the litigation. The role of the overwhelming number of Class members was simply to complete two claim forms. As the Court itself found, the Marcoses had established a sophisticated network of dummy corporations to secrete their assets. To this day, the Marcoses have never voluntarily contributed any money to pay down the Judgment. Any recovery against the Marcoses is a feat of grit and determination, especially in light of the substantial claims of the Republic and its open opposition to the human rights victims receiving any compensation. The Republic, employing far larger resources and people than Class Counsel had available, was itself stymied in its recovery of Marcos assets. The United States government, with all its resources, failed in its criminal RICO case against Mrs. Marcos.

It must also be remembered that satellite litigation in this case was enormous. Cases were filed on three continents. Each was vigorously contested and usually resulted in appeals. Class Counsel spent 10 years attempting to recover Marcos assets and initiated eleven lawsuits to locate and execute upon those assets against Swiss banks and other parties. Unlike the normal antitrust or

---

2002.

19045_1

securities case that involves a single proceeding which usually settles before trial, this case involved myriad lawsuits that were hotly contested.

Weighing these circumstances, the result obtained is without equal in the annals of human rights law.

### B.    The Litigation Was Risky and Any Recovery Was Contingent

Numerous cases recognize that risk is an important factor in determining a fair fee award. *See, e.g., WPPSS*, 19 F.3d at 1299-1301; *Detroit v. Grinell Corp.*, 495 F.2d 448,470 (2nd Cir. 1974).    The financial risk to Class Counsel of no recovery was enormous.  There was no precedent for this case.  No class action had ever been brought on behalf of alien human rights victims, much less  certified.  The case was dismissed and on appeal in the Ninth Circuit for three years between 1986 and 1989.    In 1996 the Ninth Circuit commented upon the result and difficulty of this case:

> The subject matter of this case is unusual.  So is the size of the judgment awarded to the plaintiffs.  Some of the parties are prominent figures.  The difficulty of enforcing that judgment is also no doubt greater than usual, given the location of the assets and the uncooperativeness of the judgment debtor.

*Hilao v. Estate of Marcos*, 95 F.3d 848, 855 (9th Cir. 1996).  In 2004 the Ninth Circuit had occasion to again comment that "[c]ollection of that judgment proved exceedingly difficult for the Hilao plaintiff class ...." *Hilao v. Estate of Marcos*, 393 F.3d 987, 989 (9th Cir. 2004).  Unlike securities and antitrust cases, lawyers

were not tripping over each other to file lawsuits against Marcos on behalf of indigent Filipino human rights victims. In fact, no other class action was filed on behalf of the victims. *See* Turbin Affidavit at Exhibit "K". Furthermore, the costs in the case, $1,033,900.09 (thru April 2006), were substantial and had to be carried for 20 years.

This case also involved significant physical danger and threats, a factor which has been recognized by the Ninth Circuit in justifying enhanced fee awards. *See Guam Soc. Of Obstetricians & Gynecologists v. ADA*, 100 F.3d 691, 698 n.7 (9th Cir. 1996). Because the members of the Philippine military who carried out Marcos' abuses were still in place after Marcos fled the Philippines, victims and witnesses were afraid to come forward. There was constant danger that if members of the military felt threatened they might retaliate. In April 1992 an officer in the Philippine military stationed in Camp Aguinaldo told Lead Counsel that he was being watched and was in danger. Shortly thereafter a presidential assistant pointedly inquired as to what documentation might be introduced which implicated the Republic's then President, Fidel Ramos. In January 1993 Messrs. Swift, Domingo and Saguisag were jeered and assaulted by a crowd of 500 persons outside the Marcos' San Juan residence while trying to gain entrance to take Imelda Marcos' deposition. On leaving they were pelted with eggs and tomatoes. A photo in the newspaper the next day showed damage to their car. *See* Exhibit "D". In

October 1994 Messrs. Swift and Domingo were enjoined by the Republic from taking depositions of their clients in the Philippines.  When this Court directed that they continue, the Republic sought to hold them in contempt of court, and they were required to defend themselves in a hearing.  The Philippine Solicitor General threatened during a television appearance to have Mr. Swift deported.  A month later the Philippine Senate introduced a measure to have Mr. Swift declared *persona non grata*.  In 1995 Mrs. Marcos filed a criminal complaint against Mr. Swift with the Ombudsman.  In June 1997 a Marcos crowd of 50 confronted and jeered Messrs. Swift and Domingo following a hearing in Makati regional court to enforce this Court's Judgment.  In September 1997 a Swiss bank filed a criminal complaint against Mr. Swift in Zurich alleging that he was suing the bank in the United States using false information.

The complexities of the lawsuit and the risks plainly support an interim award of 30% of the recovery to date.  Class Counsel have received no compensation during the course of the litigation and have advanced significant expenses in prosecuting the action for the benefit of the Class.  Any fee or reimbursement has been substantially at risk for 20 years and completely contingent upon obtaining a recovery for the Class.

19045_1

### C.    Class Counsel Were Skillful and Demonstrated Creativity and Ingenuity

The plaintiff Class benefited substantially from having some of the best attorneys in the United States and the Philippines represent them.  Mr. Swift has 32 years experience in litigation and has been lead or co-lead counsel in a host of major cases including, most recently, the German Holocaust cases (settled for $5 billion), the Austrian Holocaust cases (settled for just under $1 billion), the *Swiss Bank Holocaust* litigation (settlement for $1.25 billion), the *Austrian Bank Holocaust* litigation (settlement for $40 million) and the *Amino Acid Lysine* litigation (settlement for $50 million).  In 1995 the National Law Journal named him one of the top ten litigators nationally.  Ms. Broder is a seasoned litigator and a former president of the Hawaii State Bar Association.  Mr. Swift and Ms. Broder have been finalists in three separate years for the Trial Lawyer of the Year Award given by the Trial Lawyers for Public Justice.  Jon Van Dyke is a professor of international law at the University of Hawaii Law School and the author of numerous books and law review articles.  Messrs. Domingo, Fruto and Velez (deceased in 1991) are highly regarded and experienced litigators in Manila.  Mr. Fruto is a past president of the Philippine Bar Association.  A lawyer and former Philippine Senator, Rene Saguisag, provided able legal assistance and opened doors to high government officials.  He is not seeking compensation for his services.

19045_1

The ingenuity and creativity of counsel made the case successful. Class Counsel developed and advocated new legal theories which were ultimately adopted by this Court and the Court of Appeals. Class Counsel's use of Rule 23(b)(1)(B) for class certification was novel but fit the circumstances perfectly. The development of random sampling and benchmark awards during the compensatory damage phase of the case was innovative both for human rights and mass tort litigation. Counsel supported this approach with facts and witnesses. Class Counsel's use of Philippine law supplied the Plaintiff Class with a legal basis for its $1.2 billion exemplary damage award that would have been unavailable on a punitive damages theory under United States law.

Legal counsel opposing Class Counsel were sophisticated and resourceful with overwhelming financial resources. Testimony during the contempt hearing in 1995 showed that counsel had received over $5 million for their work. Messrs. Linn and Bartko are among the best known trial lawyers in the United States. Mr. Linn had successfully defended Adnan Khashoggi in the criminal RICO case against Khashoggi and Imelda Marcos tried in New York in 1990. They were supported by a raft of legal talent in the Philippines. In addition to the Marcos' own defense counsel, they were consistently supported by able lawyers representing the Swiss banks, the Swiss government, the Republic and the United States Justice Department with *amicus curiae* briefs in this Court and the Court of

21

Appeals. Both the Philippine and Swiss governments delivered a total of almost a dozen diplomatic notes to the United States Department of State complaining about the actions of Class Counsel and the Court.

### D.    Time and Labor Involved

The time and labor involved since 1986 is over 35,000 hours although only 4,078 hours were directly incurred in the recovery of the approximately $36.4 million now present in the common fund. *See* Summary attached as Exhibit "A". Specific Declarations and Affidavits attached as Exhibits "E" through "J" and "L" support the Summary.[7]  Spanning 13 years, the main case entailed three trials and over a dozen appeals. *See Six (6) Mexican Workers*, 904 F.2d at 1311 (case that took 13 years)  The collection proceedings, so far, have taken 11 years and involve many of the satellite litigations, especially execution proceedings.  With the exception of the Marcos car, each of the four execution proceedings which resulted in the recovery of money was hotly contested.  The litigation in *Merrill Lynch v. Arelma* alone has taken almost 6 years.

The Affidavit of Richard Turbin, an experienced Honolulu attorney, supports the reasonableness of the hourly rates applied. *See* Exhibit "K".  Class Counsel anticipate that  they will spend many more hours in connection with future execution proceedings, including the Singapore interpleader, and the Texas and

---

[7]    Detailed fee reports for the period March 1986 thru February 1999 were filed with the Court in April 1999.

19045_1

Colorado proceedings. The distribution of the common fund to Class members will entail additional time and costs.

The number of hours devoted to the litigation demonstrates real efficiency on the part of Class Counsel. The enormity of the litigation could easily have resulted in twice as many hours being spent. The hours spent also do not reflect the substantial work done by staff members in the United States and the Philippines. In addition, the relatively modest hourly rate of counsel in the Philippines has kept the lodestar low.

Class Counsel recommend that the Court set aside $100,000 in the fund to pay hourly fees and costs being incurred by Singapore counsel in the current interpleader proceeding (who are not permitted to bill contingently); $600,000 to pay fees and expenses of the Special Master; and $75,000 for the cost of distributing compensation to the Class members.

### E.    Customary Fee in the Marketplace for Personal Injury Work

The customary contingency fee for attorneys in Hawaii and the Philippines handling normal personal injury claims is 33 to 40%. Any class member, if he or she could even find representation, would have had to pay this rate. This case was hardly normal. As stated above, it involved legal complexities far beyond what the normal personal injury attorney could handle, including litigation on three continents.

**F.    The Requested Award Is Needed to Encourage Other Attorneys to Pursue Human Rights Cases.**

Although the bundle of offenses known as human rights violations are among the most basic and precious to civilization, the development of a victim compensation enforcement jurisprudence is in its incipiency.  Major reasons for this are that victims seldom can afford to hire attorneys, perpetrators flee the jurisdiction, assets are concealed in safe-havens, and judgments are uncollectible. Almost all of the other human rights cases that have been brought in the United States, even when the verdicts have been in favor of the victims, have not led to monetary compensation going to the victims.[8]  This means that attorneys have no way of being paid for their time and no prospect of even recovering their costs. The reality is that few lawyers or law firms are able to undertake the risk of prosecuting a major case without any prospect of compensation for 20 years against well-financed opposition.   The most experienced lawyers will avoid physical dangers preferring to litigate safe and remunerative cases.  Yet human rights abuses — even since the filing of the instant lawsuit in 1986 — have been rampant and out of control.   Bosnia, Kosova, Rwanda, Congo, East Timor, Afghanistan, Iraq, Sudan — the list goes on and on.

---

[8]     The only notable exception is the Holocaust Litigation in which the United States government played a key role in mediating settlements totaling $7.5 billion. *See* Eisenstat, Imperfect Justice, (Public Affairs 2003).     In *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992), the Argentine government paid the damages.

24

There is no shortage of attorneys pursuing securities and antitrust cases in this country, which makes those laws self-enforcing without large government involvement.    The reason is the promise of reasonable counsel fees.    The prominence of the instant case gives this Court the unique opportunity to encourage other lawyers to pursue compensation for human rights victims simply by making an interim award of the requested amount.    Furthermore, Class Counsel in this case need that encouragement to continue to pursue collection of the Judgment.

## V.    Class Counsel Are Entitled to Reimbursement of Their Expenses

Class Counsel have incurred costs and expenses in an aggregate amount of $1,033,900.09 (thru April 2006) in prosecuting this litigation.    The expenses are summarized in Exhibit "E-2".[9]    The expenses incurred were necessary to the litigation, not extravagant, and reasonably related to the interest of the class.    *See In re THC Financial Corp. Litigation*, 86 F.R.D. 721, 740 (D.HI 1980).    In order to remain financially viable through 20 years of litigation, Class Counsel had to be frugal.    Virtually all the expenses were advanced by Lead Counsel's law firm or himself.    By comparison with other cases of shorter duration and geographic dimension, the total expenses are modest.

---

[9]    Detailed expense reports for the period March 1986 thru February 1999 were filed with the Court in April 1999.

25

Expenses are compensable in a common fund case when they are of the type typically billed by attorneys to paying clients in the marketplace. *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994). Therefore, it is proper to reimburse reasonable expenses even though they are greater than taxable costs. Id. *See also Bratcher v. Bray-Doyle Indep. Sch. Dist. No.42*, 8 F.3d 722, 725-26 (10th Cir. 1993).

The single greatest cost in the litigation, not surprisingly, is travel, inclusive of transportation, food and lodging. Lead Counsel traveled to the Philippines almost 30 times, to Hawaii over 40 times, to Los Angeles over 15 times, to Hong Kong twice, to Australia once and to New York many times. Other counsel also traveled to attend hearings and depositions in Hawaii, New York and the Philippines. Messrs. Swift, Domingo and Fruto, several court reporters and a court reporter spent five weeks traveling around the Philippines in the fall of 1994 taking 200 depositions at the Court's direction. Mr. Swift, Ms. Broder and Mr. Domingo all spent a week at the mediation in Hong Kong in January 1996. In addition, the travel and lodging expenses for all fact and expert witnesses testifying at trial in Hawaii had to be advanced by Lead Counsel.

Several categories reflect the cost of giving class notice. A total of four class notices, two involving publication, were made pursuant to court order, and translated into one or more languages. A fifth class notice will be made in

19045_1

connection with the instant motion. The cost of publishing, photocopying and mailing has been substantial for the 10,000 member Class even though Class Counsel did it in as cost-effective a manner as possible.

## CONCLUSION

For the reasons set forth above, Plaintiff Class Counsel request the Court to make an interim fee award of 30% of the recovery, after first deducting and reimbursing expenses in the amount of $1,033,900.09. In addition, Class Counsel request the Court to set aside in the Fund $600,000 for the Special Master's fees and costs; $100,000 for payment of fees and expenses to be incurred for Singapore counsel; and $75,000 for costs to be incurred in making distribution to Class members.

Respectfully submitted,

Date: May 17, 2006

Robert A. Swift
Sherry P. Broder
Lead and Liaison Counsel

27

19045_1