## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| IN RE:<br><br>ESTATE OF FERDINAND E. MARCOS HUMAN RIGHTS LITIGATION | MDL NO. 840<br>No. 86-390<br>No. 86-330 |
| THIS DOCUMENT RELATES TO:<br><br>Hilao et al v. Estate of Ferdinand E. Marcos,<br>          and<br>DeVera et al v. Estate of Ferdinand E. Marcos. | DECLARATION OF ROBERT A. SWIFT |

ROBERT A. SWIFT, declares under penalty of perjury as follows:

1.      I am an attorney practicing law as a senior member of Kohn, Swift & Graf, P.C. in Philadelphia, Pennsylvania.  I have been practicing law for 31 years and am admitted to the bars of many state and federal courts, including the Pennsylvania Supreme Court and the United States Supreme Court.  This Declaration is submitted in support of Class Counsel's Joint Motion for an Interim Award of Attorneys Fees and Reimbursement of Expenses.

2.      I initiated the above cases in March 1986 shortly after the "Bloodless Revolution" in the Philippines that removed Ferdinand E. Marcos from

4381_1

the presidency. Because there were over 10,000 Filipinos who had been tortured, summarily executed or disappeared, I decided to file the lawsuit as a class action. Together with my Filipino co-counsel, I entered into representation agreements with over a dozen Filipinos. My firm agreed to advance the costs of the litigation.

3.    I drafted the first complaint against Ferdinand E. Marcos, the Hilao case, which was filed in federal court in Philadelphia, Pennsylvania on April 7, 1986. After some discovery and motion practice, it was transferred to the District of Hawaii. The second case, DeVera, was filed as a protective action in federal court in Hawaii in the interim and consolidated with Hilao. Both were served on Marcos at his residence in Hawaii. Sherry Broder and Jon Van Dyke, Hawaiian lawyers who had filed the Trajano (direct action) case, agreed to work as co-counsel on the class action cases.

4.    At the time the Class was certified in 1991 I was appointed Lead Counsel and Sherry Broder was appointed Liaison Counsel. Jon Van Dyke was appointed Class Counsel, and Filipino counsel continued to assist in all phases of the litigation. During the next 9 years the Washington DC law firm of Anderson, Hibey, Nauheim & Blair represented Ferdinand Marcos and filed a voluminous Motion to Dismiss the class action complaints, raising ten separate reasons for dismissal. We responded with a brief in excess of 50 pages and propounded

2

certain discovery.  We also began coordination with other lawyers who had filed direct action cases against Marcos.

     5.    Acting on the basis of letters rogatory granted by the federal court in Philadelphia, I arranged for Velez to initiate an enforcement proceeding in Quezon City, Metro Manila.  The letters rogatory sought records about the Class members from the secretary of defense (Juan Ponce Enrile) and chief of staff of the Philippine military (Fidel Ramos).  I traveled to Manila a second time in June 1986 to prepare for the Philippine court's hearing on the letters rogatory.  Since letters rogatory were then a nuance in the Philippine courts, the judge assigned to the case conducted a thorough hearing in open court.  Also on that trip, I interviewed numerous Class members and took their statements.  At that time Velez introduced me to Rodrigo Domingo, a Filipino litigator, who began working as co-counsel and, after Velez' death in 1991, took over Velez' role.  From the very inception of this case, the Filipino attorneys who worked as Class Counsel made significant contributions to the result and the settlement.  They established liaison with the Philippine government attorneys and the Marcos Philippine attorneys.  They organized all the litigation and meetings in the Philippines, and handled class notices and class member communications.

     6.    The federal court in Hawaii held oral argument on the Marcos Motion to Dismiss in July 1986.  Two weeks later it dismissed the case based on

4381_1

the Act of State doctrine, reserving decision on the other defenses. We filed a prompt appeal to the Ninth Circuit Court of Appeals. In the meantime, the Philippine court suspended decision on the letters rogatory.

7. Over the next year we briefed the appeal and obtained an *amicus* brief from the Philippine government supporting the appeal which was signed by the Minister of Justice. This brief proved valuable in this appeal as well as later appeals before the Ninth Circuit when the Philippine government, with Ramos as President, objected to the litigation. Plaintiffs' counsel attended oral argument on the appeal at the Ninth Circuit's courthouse in San Francisco in June 1987. The oral argument lasted over an hour. Two years later, in July 1989, the Ninth Circuit reversed the district court and remanded the case for further proceedings. During the three years the case was on appeal I continued in contact with Velez trying to get leads on witnesses and documentary evidence in the case.

8. In October 1989 I went to Manila to meet with Fidel Ramos, now secretary of defense, to urge him to assist us in obtaining documentary evidence. The meeting was in Camp Aguinaldo. I specifically requested copies of arrest orders of political detainees between 1972 and 1986. He asserted ignorance of any human rights violations but said he would assign military personnel to assist me in locating pertinent documents. I returned to Manila in February 1990 to follow up with specific military personnel who were supposed to be locating documents for

4

me. A succession of meetings and promises over the next two years led to the production of no documents. A renewed request for documents from the military in the spring of 1992 led a military officer to advise me that I was under surveillance by the intelligence branch of the military, and that I should be "very careful." We ultimately had a Philippine court enforce the letters rogatory, and Mr. Domingo took the deposition of the military chief of staff on the issue of whether any documents existed. Also on that trip I interviewed several potential expert witnesses as I began to create a model of how the liability phase of the case might be tried.

9.    In January Mr. Sheils and I went to Seattle, Washington to review discovery documents and evidence obtained in the Domingo/Viernes case, a double murder which resulted in a civil liability verdict against Ferdinand and Imelda Marcos.

10.    In February 1990 Chief Judge Fong held two hearings on the pending motion to dismiss and motion for class certification in Hawaii which I attended. A decision on these motions was deferred because the Belli law office filed before the Panel on MultiDistrict Litigation a motion to consolidate all human rights cases against Marcos.

11.    Also in that month Mr. Sheils of my office began a comprehensive review of United States government records pertaining to Marcos

4381_1

which were housed at the non-profit National Security Archive in Washington, D.C. These documents were the product of several years of FOIA requests by this non-profit group. Over the next 2 ½ years he made FOIA requests to 10 different federal agencies and reviewed many thousands of documents. When government agencies objected to production of documents, Mr. Sheils filed appeals.

12.    I drafted papers for the MDL panel regarding consolidation. In May 1990 I presented oral argument to the MDL panel which was sitting in Sioux Fall, South Dakota. Ultimately the panel consolidated the Class cases with several direct action cases and assigned Judge Manuel Real to manage the cases. In September 1990 I drafted a Case Management Order and circulated it among plaintiffs counsel for comment.

13.    In November 1990 Judge Real held his first hearing in the case in Honolulu. With minor revision he entered the Case Management Order. He also set final briefing and oral argument on the motion to dismiss. My co-counsel and I spent significant time re-working our arguments, including research on the issue of abatement. I presented oral argument before the Court on the motion on January 28 in Honolulu, which led to the Court denying the motion.

14.    The Court then set a schedule for briefing and argument on the motion for class certification. At my request the Court joined this with a hearing on damages in the Trajano direct action case where there had been a default against

6

Imee Marcos-Manotoc.    I worked extensively on the reply brief for class certification to garner justification for a Rule 23(b)(1)(B) certification.    The hearings were held on March 25, 1991 in Hawaii.    Ms. Broder and I jointly prepared witnesses for the damage hearing.    At the hearing the Court entered a $4.4 million damage verdict against Imee Marcos-Manotoc.    After my oral argument on class certification, the Court certified the plaintiff Class under Rule 23(b)(1)(B).    I then drafted an Order which the Court entered on April 15, 1991. During this trip Ms. Broder and I first interviewed Benjamin Muego, an expert on the Philippine military, who ultimately agreed to testify as an expert witness.

15.    In February 1990 I spent a day at the National War College in Washington D.C. reviewing books and other documents about the Philippine military in its extensive library.

16.    In early April 1991 Ms. Broder and I interviewed Sister Mariani Dimaranan at the Maryknoll College of Theology on Ossining, New York regarding documentation of human rights abuses in the Philippines.    On April 4 and 5 I took the depositions of Imelda and Ferdinand R. Marcos in New York City. Several days later I left for a 3 week trip to Manila to prepare numerous Class representatives and witnesses to give depositions.    I also met with potential expert witnesses, and made arrangements with a university in the Philippines to create a database of information collected by various human rights groups in the

Philippines.  At a cost of about $5,000 I hired the university's computer lab for 8 weeks, a professor of computer sciences and a dozen students who spoke the major languages of the Philippines.  A paralegal from my office supervised the project. The students worked 12 hours a day, six days a week inputting about 20,000 documented abuses over the years 1972 to 1986.  In return for the assistance of the human rights groups in providing their documents (which each jealously guarded), I gave each a set of the database.  This was the first countrywide database of human rights abuses ever created and enabled the groups to enter data of new violations.  I also began drafting a consolidated amended complaint on this trip.

17.    In May 1991 I drafted a discovery stipulation and circulated it to all counsel for comment.  On May 2 I met with former (under President Carter) Secretary of State Cyrus Vance and his former deputy for Asia, Richard Holbrooke, to see whether they would be potential trial witnesses.  They suggested Steve Bosworth, former Ambassador to the Philippines, who had direct meetings with Marcos. This led to a series of meetings with Bosworth in New York City and his eventual testimony at trial.   I drafted and submitted answers to expert interrogatories and a motion for approval of class notice.

18.    In mid-May I left for a 2 ½ week trip to the Philippines where I was joined for a week by Ms. Broder.  Together we took discovery and videotape depositions of the Class representatives and witnesses for use at trial.   Mr.

8

Domingo and Mr. Fruto were instrumental in organizing the depositions and interviewing the witnesses. This was exhausting work, since for many witnesses it required speaking through an interpreter. Also on that trip I met with some expert witnesses and made arrangements for mailing and publishing class notice. On May 27 I attended with attorney Domingo a court hearing in Quezon City on the letters rogatory.

19.    In June I took the deposition of Charles Salmon at the US Department of State in Washington D.C. He had gathered and reported evidence on the torture of a Filipino female, Trinidad Herrera, in April 1977. Portions of his testimony were read at trial.

20.    In July 1991 I attended a pretrial conference before the Court in connection with discovery issues and scheduling for defendant's motion for summary judgment. In August 1991 Mr. Sheils finally obtained from the US Attorneys Office in New York copies of documents from the criminal RICO case against Imelda Marcos which he then reviewed.

21.    In August and September 1991 we briefed legal issues and obtained affidavits and documents to use in opposition to defendant's motion for summary judgment. In particular, we developed a theory of proof of responsibility for human rights abuses by showing a pattern and practice. I traveled again to Manila to work with the expert witnesses on their affidavits.

22.    In early October 1991 Ms. Broder and I took the depositions of several Marcos affiliated witnesses who were residing in Hawaii, and presented a motion for contempt against one relectant witness. I presented oral argument on the motion for summary judgment, and the Court denied the motion.

23.    In late October and November 1991 my office and I spent substantial time seeking and obtaining a temporary restraining order and preliminary injunction to bar the transfer or dissipation of the Marcos Estate's assets. Mrs. Marcos was returning to the Philippines, and the Philippine government had consented to releasing its injunction. However, the law did not favor a pre-judgment injunction in a case seeking monetary damages, and the Ninth Circuit had never ruled on the issue. Fortunately, the complaint did request injunctive relief. The Court granted the injunction, which was critical to preserving assets for ultimate execution. I then served the injunction on certain Swiss banks since the injunctions extended to the Marcoses representatives and agents.

24.    The next several months were devoted to trial preparation. On January 13 we submitted our pretrial memorandum, and the Court held a pretrial conference on January 20 in Honolulu which I attended. We continued to obtain and review documents, interview witnesses and talk to expert witnesses. We worked with numerous expert witnesses, all of whom agreed to testify *pro bono*,

and comply with the Court's Order that we submit their direct testimony narratives in writing. I again traveled to Manila to work with the expert witnesses there. We also prepared and served a successful motion in limine which was critical to preventing the defense from raising at trial the accusation that all our witnesses were communists.

25.     The Court then permitted defendant's counsel to take the depositions of all plaintiffs' expert witnesses and to re-take the depositions of plaintiffs' witnesses in the Philippines. In early March I again traveled to the Philippines for three weeks and prepared over a dozen expert and fact witnesses to testify, and defended them at their depositions. Defense counsel also took the depositions of four Philippine military personnel whom I cross-examined. In addition, I finally received access to Marcos' private documents stored at Malacanang Palace. Over the course of two days I reviewed these documents and selected various ones for use as trial exhibits. Immediately I started a process to authenticate the documents through the Philippine government and the US Embassy. When I returned to the United States, I prepared and defended expert witness depositions for those witnesses located in the United States.

26. The next several months involved intense trial preparation. Since a case of this type had never been tried on the merits in the United States, Class Counsel performed extensive legal research particularly as to pattern and practice

4381_1

and the doctrine of command responsibility. In particular, I investigated the use of a laserdisc to animate and display documents to a jury at trial. Because this technology was new and had only been used in only a few trials, we researched the admissibility of this and explored effective animation techniques. This technology later proved exceptionally helpful at trial in educating the jury about written communications between Marcos and his military and intelligence personnel. I drafted proposed jury charges and circulated them for comment among co-counsel. We collected exhibits for trial, digested depositions and designated and cross-designated deposition excerpts for witnesses who would not testify in person at trial. We also had videotape depositions edited in accordance with Court rulings. During this time the depositions of two expert witnesses, Steve Cohen and Sister Mariani, were re-taken by defense counsel in New Mexico and New York, respectively. We also prepared jury questionaires which were submitted to the Court. In early August we completed our legal research and submitted a brief to the Ninth Circuit on the appeal of the preliminary injunction.

27.    I arrived in Hawaii on September 1 to prepare for the trial on liability. Thirty-some file boxes from my office arrived a day later. Organization of the various pieces of the trial was like putting together a symphony. The Class' trial team consisted of myself, Ms. Broder, Mr. Sheils, Professor Van Dyke and Mr. Domingo. The Class case needed to harmonize with the direct action cases,

4381_1

and the direct action counsel had their own ideas about trial strategy. The sequence of witnesses and their travel plans had to be finalized. A total of 16 witnesses testified in person in the Class portion of the trial and 11 testified by deposition. The Class introduced about 100 exhibits. Likewise, the sequence of exhibits had to be carefully planned. I made the opening and closing arguments and examined all witnesses except for several witnesses examined by Ms. Broder. After 11 trial days, the jury returned a verdict in favor of the Class.

28.    After returning to Philadelphia, I went to New York City to meet with Philippine Foreign Minister Romulo and Justice Minister Drilon to discuss a settlement or coordinated litigation since the Philippine government was also suing the Marcos estate. They invited me to Manila for more meetings in mid-October. However, when I went to Manila it was clear that the Philippine government saw the class suit as a threat to its recovery of Marcos assets. It then started an involuntary probate proceeding in Manila and contended in a press release that the Class members would have to prove their claims anew before the probate court. I also met with human rights groups in Manila to discuss circulating proof of claim forms that the Court would require. After my return, I went to New York City to renew my effort to settle the case with defense counsel James Linn.

29.    We drafted and submitted to the Court a motion for approval of class notice together with proposed claim forms. In addition, we briefed and

submitted to the Court a response to the Marcos' motion for judgment notwithstanding the verdict. We also began in earnest to plan for the damage phase of the case. On December 15 we submitted a brief to the Court proposing to bifurcate exemplary and compensatory damages and try them in that order.

30. At a hearing in Los Angeles on November 16, 1992 the Court extended the preliminary injunction to specific Swiss banks, and I arranged for service of the injunction on the banks. In January 1993 I subpoenaed four Swiss banks in New York City to produce records regarding Marcos accounts. When they refused to produce documents, I moved to compel. The motion was heard by Judge Sprizzo in Federal Court in Manhattan on March 8, 1993. The Swiss government filed a surprise *amicus* brief that same day. He denied the motion and required that we proceed by letters rogatory. On motion, this Court granted the letters rogatory and they were submitted through diplomatic channels for service in three cantons in Switzerland. I engaged the Swiss attorney Christoph von Graffenreid to handle the prosecution of the letters rogatory in Switzerland. After months of effort, briefing and expense, a Swiss court in one canton wrote a hostile opinion and denied enforcement of the letters rogatory, and courts in the other cantons followed suit.

31. In mid-January 1993 I went to Manila to take the depositions of Imelda Marcos and Ferdinand R. Marcos on the subject of the wealth of the

4381_1

decedent Ferdinand E. Marcos.  The testimony of both was evasive.  Mrs. Marcos had filed a criminal complaint against me and two trial witnesses before the Ombudsman shortly after the jury verdict.  When I arrived at her house to take her deposition my Filipino co-counsel and I were surrounded by a pro-Marcos mob of 500 who damaged one of our cars before (after 10 minutes) we gained entrance. The same mob jeered us as we left and threw eggs and tomatoes at us.

32.     In February 1993 I prepared Caesar Parlade, a forensic accountant and damage expert, to testify at deposition about the Marcos wealth. Ms. Broder and I defended his deposition in Honolulu.

33.     In March 1993 we published a new class notice and distributed claim forms throughout the Philippines and the world.  This was coordinated by Mr. Domingo whose office handled most inquiries and logistics.  His office compiled a log of the 10,059 proof of claim forms as they were received.  In order to save money, my office began creation of a new computer database as to the proof of claims.

34.     On May 4, 1993 Professor Van Dyke and myself presented oral argument to a panel of the Ninth Circuit sitting in Hawaii hearing the appeal of the preliminary injunction.  Later that month I met in Newark, New Jersey with the Solicitor General of the Philippines and Rene Saguisag to again see whether we could pursue our claims cooperatively.

35.    In late 1993 I began preparing for the trial of exemplary damages. This entailed legal research of exemplary damages under Philippine law and punitive damages under American law. I drafted proposed jury instructions and Ms. Broder and I collaborated on trial exhibits. Just before the trial, I went to the Philippines to have a joint meeting with James Linn and the Chairman of the PCGG to try to settle the case. This failed. I presented the Class' case on exemplary damages, producing Caesar Parlade as an expert witness in forensic accounting on the issue of the extent of the Estate's assets. The jury awarded the Class $1.2 billion.

36.    In March 1994 we began to prepare for the compensatory damage phase of the case. Since it was financially impossible to bring all Class members to Hawaii, we researched and devised a methodology based on inferential statistics to allow a random sampling of the claimants and a benchmark award by the jury. Ms. Broder located an expert in inferential statistics in Hawaii, Mr. Dannemiller, who assisted us in formulating this theory. Mr. Dannemiler submitted an affidavit to the Court and then testified at a hearing on August 18 as to the basis for this approach to damages which included a random selection of 137 claims for examination. He later testified at the trial on compensatory damages.

37.    In May 1994 I went to Manila and met with several high ranking members of the government to explore a way of breaking the 3-way impasse to

16

settlement, including a meeting with former President Aquino. Mr. Domingo and I also reviewed the 10,059 claim forms and listed the ones that were facially invalid. After giving notice to the 500 some Class members whose claims were facially invalid, I moved the Court to exclude such claims, which motion the Court granted.

38.    In July 1994 I drafted and filed a motion to extend the preliminary injunction to the Philippine government based upon secret agreements that the Marcoses entered into with the Philippine government. The Court scheduled a hearing for September 12. In advance thereof, I again went to Manila to meet with James Linn and the PCGG Chairman to forge a 3-way deal and settle the litigation. When this failed, I presented our evidence at the injunction hearing in Honolulu, and the Court granted the injunction. The Philippine government filed an emergency appeal which was fully briefed and then argued by Professor Van Dyke and myself in the Court of Appeals on February 13, 1995. The United States filed a lengthy amicus brief in support of the Philippine government.

39.    October, November and December 1994 were devoted to preparing for the trial on compensatory damages. The Court appointed Sol Schreiber as Special Master. The original plan was to have a dozen special masters hear the deposition testimony about the 137 claims. However, the Philippine government obtained a temporary restraining order against the depositions being

taken, and the Court withdrew the special masters from the Philippines. The Court then ordered Lead Counsel to proceed with the depositions. When I did so, the Philippine Solicitor General filed a motion to hold me (and my Philippine co-counsel) in contempt and deport me. Following a raucous three hour court hearing, the Philippine Regional Trial Court withdrew the injunction and denied the contempt. Three weeks later a Philippine senator introduced a resolution to have me declared *persona non grata*. It took five weeks to complete the depositions, which consisted of about 200 individuals testifying in ten different languages. Messrs Domingo, Fruto and myself traveled throughout the Philippines with court reporters, translators and a notary to complete the depositions, often working between 12 and 16 hours a day. When complete, the transcripts were sent to Special Master Schreiber for use in his report. The Court held a pretrial conference on December 9 which Ms. Broder and I attended. Later in the month I drafted jury charges for the trial. Because the damage methodology was new, these jury instructions required careful consideration and research.

40. With Ms. Broder, I conducted the trial on compensatory damages starting on January 9, 1995. While the Special Master had rejected six claims as invalid in his report, I convinced the jury that only two could not be substantiated, and this was for lack of evidence. The jury returned a verdict of $766 million on

18

January 18.  The Court entered a final judgment on February 3, 1995 for the Class in the overall amount of $1,964,000,000 together with a permanent injunction.

41.    During the trial on compensatory damages, I drafted and presented to the Court a motion for contempt against Imelda Marcos and Ferdinand R. Marcos for violating the preliminary injunction by entering into illegal agreements with the Philippine government to divide and transfer the assets of the defendant Estate.  The Court directed that I take discovery.  However, Imelda Marcos and Ferdinand R. Marcos refused to appear at their depositions in Manila or to produce documents.  Following hearings on April 24 and May 12 in Honolulu and Los Angeles, the Court entered sanctions against them for failure to comply with discovery and held them in contempt with a fine of $100,000 beginning May 30, 1995.  When the Marcoses refused to purge their contempt, the Court, on my motion, granted the Class an assignment of the Marcos Swiss bank accounts.

42.    In April 1995 I initiated execution proceedings in Los Angeles against several Swiss and Hong Kong banks in which the defendant Estate's assets were purportedly held.  All but the Swiss banks cooperated in satisfying Lead Counsel that they held no Marcos accounts.  The Swiss banks mounted a large scale defense against execution resulting in depositions in Los Angeles and Toronto and significant briefing.  The Swiss banks claimed, *inter alia*, the judicial assignment was invalid and that accounts not located in the United States were not

19

subject to the reach of a United States court. The Swiss banks took an interlocutory appeal to the Ninth Circuit which dismissed the execution proceeding on the basis of California's specific execution statute.

43.    Class Counsel mounted other efforts to collect or preserve the assets of the defendant Estate for execution. Class Counsel successfully executed on a Mercedes limousine owned by Marcos and collected $30,000. They also executed upon the house in Makiki Heights where the Marcoses resided. The Philippine government and Golden Budha case intervened in the action. On the eve of trial Class Counsel settled for $1 million (the house was worth $2.5 million) while the others went to trial and lost. In addition, Class Counsel investigated various leads and sources purporting to know the location of the defendant Estate's assets.

44.    Class Counsel also commenced the <u>Rosales v. Credit Suisse</u> lawsuit in federal court in Los Angeles in September 1996 to preserve the assets of the defendant Estate through injunctive relief against two Swiss banks. Class Counsel obtained a preliminary injunction but, on appeal, the case was dismissed by the Ninth Circuit. Class Counsel transferred the Class Judgment to Illinois and commenced an execution proceeding there against the Swiss banks because of Illinois legal precedent permitting execution on foreign bank accounts. However, the federal court in Chicago dismissed the proceeding. Based on documentary

4381_1

information from an Australian investigator, Class Counsel initiated <u>Argenal v. Union Bank of Switzerland</u> in federal court in Los Angeles in September 1997 alleging that the Marcoses had gold and investment accounts in several Swiss bank accounts. After substantial litigation and hearings, that proceeding was voluntarily dismissed when it appeared the documentary information was unreliable. This led to one of the Swiss banks filing a criminal complaint against me in Switzerland.

45.    Class Counsel also intervened in an interpleader action, <u>Republic of the Philippines v. Christies</u>, the New York Auction house, over ownership of the Picasso painting known as "Portrait of a Woman." That action concluded two years later with $446,534.71 going to the Class. Separately, Mr. Domingo filed an action in the Philippines in May 1997 seeking recognition of the judgment so that Class Counsel could proceed with execution there. However, after a year of briefing and court hearings, that action was dismissed in July 1999 on the basis that a filing fee should have been paid based on the total number of Class members and the total judgment. Such a filing fee would have cost $8.4 million. A special appeal was taken to the Philippine Supreme Court. After the appeal languished for 6 years, that Court finally reversed, holding the filing fee tendered by us had been correct. A complaint filed by myself and Jon Van Dyke in the UN Subcommittee on Human Rights probably led to that decision. At a court

21

hearing on this matter in June 1997 in Makati, 50 pro-Marcos demonstrators confronted and jeered me and Mr. Domingo.

46.     In 1995, 1996 and 1997 plaintiffs' counsel in the <u>Golden</u> <u>Budha</u> litigation initiated three involuntary probate proceedings for Ferdinand E. Marcos in Hawaii and California.  They further sought to have an administrator appointed to control the assets of the Estate and deprive this Court of jurisdiction.  Class Counsel successfully opposed each of these probates.  Ms. Breder and Professor Van Dyke appeared in the Hawaiian probates, including appellate proceedings.  Class Counsel hired Kenneth Wolf at the Los Angeles probate firm of Hoffman Saban & Wattenmaker to oppose the California probate, including appellate proceedings, and Class Counsel paid them over $31,000 for their services.  In the opinion of Class Counsel it was absolutely essential to defeat these probate proceedings to insure any reasonable recovery for the Class.

47.     Over the course of the last twelve years Class Counsel has devoted significant time to trying to settle the instant case.  Lead Counsel and Mr. Domingo have had countless meetings with representatives of the Philippine government to fashion a settlement for the Class.  They also sought and obtained the introduction of legislation in the Philippine Congress favorable to a recovery for human rights victims.  The Special Master for settlement has also devoted significant time to settlement.  In September 1995 a solution was agreed to

4381_1

between the Philippine government and Class Counsel only to be rejected by the Marcoses. Out of spite, Mrs. Marcos then filed another criminal complaint against me with the Ombudsman. In January 1996 the Swiss banks sponsored a week long mediation in Hong Kong attended by the Philippine and Swiss governments, the banks, the Marcoses and Class Counsel. The mediation concluded without finding a solution.

48.    The defendant Estate appealed the final judgment of February 3, 1995 to the Ninth Circuit raising ten or more issues. Class Counsel thoroughly researched and briefed the issues, and Messrs. Swift and Van Dyke argued orally. An appeal of the contempt citation was also appealed, briefed and argued orally by Mr. Swift. In December 1996 the Ninth Circuit Court of Appeals affirmed both the final judgment in favor of the Class and the contempt citation. In December 1997 the Swiss Supreme Court, in a case involving the frozen Marcos assets, ruled that the Philippine government could hold the money in escrow, but that the Class of human rights victims in the class action had to be compensated by the Philippine government.

49.    Two months after President Joseph Estrada took office in the Philippines, Mr. Domingo and I met with him at Malacanang Palace and initiated negotiations which culminated in a settlement for $150 million. The settlement

agreement was negotiated by Class Counsel and signed by them on December 19, 1998. The Marcoses also were signatories to the agreement.

50.     A third Class Notice was sent to Class members in April 1998 advising them of the status of the litigation and warning them against signing special powers of attorney which were then being solicited by SELDA's leadership. A fourth class notice was sent to Class members in early March 1999 advising them of the potential settlement.

51.     The settlement agreement provided that the settlement fund was to be transferred to the Court by March 8, 1999, but this was not done. I traveled to Manila and met with President Estrada on April 15 to insist that the funds be transferred. I was not successful, but the President did promise to transfer the funds provided a Philippine court approved. In my presence the President signed an Executive Order requiring that the issue of his authority to transfer the funds be submitted immediately to the Sandiganbayan.

52.     Although the US Court gave preliminary and permanent approval to the settlement and set its own deadline of May 10 for transfer, the funds were not forthcoming.   In July 1999 the Sandiganbayan ruled that it would be unconstitutional for the President to transfer the funds.

4381_1

53.    Class counsel moved to terminate the settlement agreement for failure of funding.  The Court held several hearings and settlement conferences, but ultimately terminated the settlement agreement in November 2000.

54.    Class Counsel were proactive in the summer of 1999 in issuing subpoenas to Marsh & McLennan over a purported deal whereby the Republic would use Marcos assets derived from Swiss bank accounts as collateral for loans to the Republic.  Ultimately this form of financing was abandoned by the Republic.

55.    In July 2000, while I was on vacation in Zurich, I met with Dieter Jann, the Zurich district attorney handling Marcos disputes for Switzerland. During the meeting he mentioned there were still Marcos assets in the United States but would not disclose where or how much.  Mr. Domingo learned a month later from his sources in the Philippines that there was allegedly a Marcos account at Merrill Lynch in New York in the name of a Panamanian entity, Arelma.

56.    I then filed a complaint against Merrill Lynch and subpoenaed its personnel for depositions.  As a result of discussions with Merrill Lynch's counsel, Merrill Lynch agreed to interplead the assets, then about $35 million, into Court in Hawaii, and I agreed to dismiss the complaint without prejudice.

57.    On September 14, 2000 Merrill Lynch did file an interpleader action, *Merrill Lynch v. Arelma*, which named numerous respondents including the Republic and the Class of human rights victims.  For the next four years Class

25

4381_1

Counsel devoted thousands of hours to this case. Class Counsel obtained and reviewed thousands of pages of documents and took 10 depositions, including two depositions in France. Especially time-consuming was obtaining the deposition of a Swiss Financier, Jean Louis Sunier, who created Arelma and managed the account at Merrill Lynch. Mr. Sunier's lawyers resisted a deposition to the point where the Court held him in contempt. Mr. Sunier's lawyers filed both appeals and mandamus in the Court of Appeals, all of which were successfully defended by Class Counsel.

58.    The Republic, its PCGG, Philippine National Bank ("PNB") and Arelma spent several  million dollars on counsel fees to prevent the Class from obtaining the interpleader funds. They filed seven or more mandamus and interlocutory appeals in the Court of Appeals and were twice successful in staying the action for a total of a year. My effort to collect the Judgment and/or settle the *Arelma* litigation with the Republic led to an hour long meeting with President Arroyo in Manila in July 2001 and a separate meeting with the Swiss ambassador. Neither effort was successful.

59.    Class Counsel tried the *Arelma* interpleader to the Court on February 24, 2004. On July 12, 2004 the Court announced its verdict and findings awarding the entire interpleaded funds, about $40 million, to the Class. Two parties, PNB and Golden Budha, as well as non-parties Republic and PCGG, filed appeals which

are pending. I delivered a 45 minute oral argument on March 15, 2005 in the Court of Appeals.

60.     Following this Court's *sua sponte* Order of September 2, 2003 threatening action against any banks which transfer Marcos assets in violation of the Court's permanent injunction, a Singapore bank interpleaded $22 million of Marcos assets into court in Singapore. Class Counsel retained an experienced Singapore attorney to represent the Class and work with Class Counsel in the on-going hearings.

61.     Class Counsel have also pursued an Order to Show Cause against PNB for violating the permanent injunction and Order of September 2, 2003 by transferring Marcos assets to the Republic. Both PNB and the Republic appealed this proceeding to the Court of Appeals. On December 28, 2004 the Court of Appeals dismissed the Republic's appeal, however PNB's appeal resulted in reversal of the Order to Show Cause.

61.     Class Counsel are committed to continuing to execute on any Marcos assets available to satisfy the Judgment, which with interest, now exceeds $3.8 billion. In April 2005 I filed lawsuits in Texas and Colorado seeking to execute on real estate that was purchased with the assets of Ferdinand E. Marcos.

4381_1

I declare under penalty of perjury that the foregoing facts are true and correct.

May 13, 2005

_____
Robert A. Swift

4381_1